******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
CHRISTOPHER BURGOS
(AC 38394)

DiPentima, C. J., and Beach and Alvord, Js.*

*Argued September 22, 2016—officially released February 7, 2017*

(Appeal from Superior Court, judicial district of
Hartford, Alexander, J. [motion for competency
examination]; Dewey, J. [motion to suppress; motion
to consolidate; judgment].)

*Richard Emanuel*, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with
whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Thomas Garcia*, former senior assistant state's
attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Christopher Burgos, appeals from the judgments of conviction, rendered after a jury trial, of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (2), one count of aggravated sexual assault of a minor in violation of General Statutes § 53a-70c (a) (1), and, in a separate information, one count of attempt to escape from custody in violation of General Statutes §§ 53a-49 (a) (2) and 53a-171 (a) (1). On appeal, the defendant claims that the trial court erred (1) by not sua sponte ordering pretrial and post-trial competency hearings and canvassing him on his purported right to testify at those hearings; (2) in joining the sexual assault information and the escape information for trial; (3) in denying his motion to suppress evidence seized from his apartment; and (4) in denying his motion to vacate his convictions for sexual assault in the first degree and risk of injury to a child on double jeopardy grounds. We affirm the judgment in part, and we reverse the judgment in part.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On August 31, 2011, the eleven year old victim and her sisters were sitting outside their home when the defendant approached them.[1] The victim did not know the defendant, but she recalled seeing him the day before. The defendant invited the victim and one of her sisters to go to the store with him to get candy. The victim agreed to go to the store with the defendant while her sister remained behind. Once the victim and the defendant were inside the store, however, the defendant said that he did not have any money on him to purchase anything. The defendant offered to call the victim's sister to ask if the victim could go with him to his apartment nearby to get some money. The defendant purportedly called the victim's sister and received permission for the victim to come with him, but when the victim asked to speak to her sister, the defendant said that her sister had already hung up the phone.

The defendant and the victim then walked to the defendant's apartment, which was a few blocks away from where the victim lived. Once at the defendant's apartment complex, the victim told the defendant that she wanted to wait outside on the sidewalk for him while he retrieved his money. The defendant told the victim to go upstairs. When she refused, he pushed her upstairs and into his apartment on the second floor. The victim tried to scream for help, but the defendant covered her mouth. Once inside the defendant's apartment, the victim hit and kicked the defendant in an attempt to get away, but she could not fight him off.[2] The defendant pushed her into his bedroom and onto his bed. Once their pants were off, the defendant retrieved a

small package from his dresser drawer. The victim again attempted to run away from the defendant, but he pushed her onto his bed, put a clear cream on her vagina, and vaginally penetrated her.

After sexually assaulting the victim, the defendant walked her home and told her that if she told anyone what happened, he would come after her. Despite the defendant's threat, the victim told her mother what happened to her once she was inside her home. The victim's mother called the police, and the victim directed the police to the defendant's apartment. The victim was taken then to an emergency room, where a sexual assault evidence collection kit was used.

That same day, the defendant was arrested at his apartment. When officers initially encountered the defendant outside of his apartment, they detained him for investigatory purposes. While he was detained, the defendant consented to a search of his apartment. During their search of the defendant's apartment, officers found a small packet of personal lubricant with the corner torn off in the trash in the defendant's bathroom and a corner piece of foil that had been torn from the packet of lubricant in the defendant's bedroom. At the police department, the defendant consented to a buccal swab so that officers could obtain a sample of his DNA. A comparison of the victim's vaginal swab and the defendant's buccal swab confirmed the presence of the defendant's spermatozoa in the victim's vaginal cavity.

For the reasons addressed later in this opinion, the defendant was not released on bond following his arrest. On September 26, 2012, during a pretrial hearing, the defendant attempted to escape custody by running for the back door of the courtroom. Judicial marshals immediately apprehended the defendant. The state subsequently charged the defendant in a separate information with attempt to escape custody in violation of §§ 53a-49 (a) (2) and 53a-171 (a) (1).

On October 9, 2013, a consolidated trial commenced on a three count long form information relating to the defendant's sexual assault of the victim and a one count long form information relating to the defendant's attempt to escape custody. On October 11, 2013, the jury returned a guilty verdict on all counts. On June 18, 2014, the court imposed a total effective sentence of fifty years imprisonment followed by five years special parole for the two informations. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant raises four claims with respect to his competency to stand trial and the process by which he was found competent to stand trial. The following additional facts are relevant to these claims. On September 1, 2011, the defendant was arraigned and appointed counsel from the public defender's office. During

arraignment, defense counsel noted that the defendant was a "client" of a mental health facility and that "[h]e appears to have been steady with his treatment there." The court, *Newson, J.*, stated that "mental health attention should be noted on the [mittimus]." During the defendant's first six court appearances, between September 1, 2011 and December 12, 2011, his courtroom behavior was unremarkable.

On January 17, 2012, the defendant was unable to be transported to court because "while in the custody of [the Department of Correction] he covered himself in feces and refused to be transported." Defense counsel moved for a competency examination pursuant to General Statutes § 54-56d, and the court[3] granted the motion and issued an order for a competency examination. On March 28, 2012, the Department of Mental Health and Addiction Services, Office of Forensic Evaluations, submitted a competency report, in which the clinical team unanimously concluded that, while the defendant was presently not competent to stand trial, there was a substantial probability that he could be restored to competency within the statutory time frame.[4] On March 29, 2012, the court held a competency hearing, at which the court agreed with the clinical team's assessment, ordered that the defendant receive treatment in an inpatient setting, and continued the case until May 31, 2012.

On May 25, 2012, Dr. Mark S. Cotterell, a forensic psychiatrist, submitted a second competency report to the court, in which he concluded that the defendant had not yet been restored to competency but was still capable of restoration within the statutory time frame. Cotterell's report acknowledged that the defendant had a history of mental health treatment and engaging in behaviors indicative of mental illness. However, Cotterell also observed that "there appears to be a volitional component to [the defendant's] presentation. It appears that he knows more than he is willing to admit." On May 31, 2012, the court held a competency reconsideration hearing at which it concluded that the defendant was not competent but was restorable to competency and ordered the defendant to continue to receive treatment in an inpatient setting. See General Statutes § 54-56d (k).

On August 16, 2012, Cotterell submitted a third competency report to the court in which he concluded that the defendant was competent to stand trial. In that report, Cotterell noted that the defendant had consistently refused to participate in formal evaluations. However, Cotterell detailed aspects of the defendant's behavior that indicated that "he has the capacity to understand his legal situation and the capacity to assist his attorney if he were to choose to do so." The report observed that "there is definitely a volitional component" to defendant's refusal to engage in a formal evaluation and that "[i]t is clear that he knows more than

he is willing to admit." The report also stated that "[the defendant] is not currently taking psychiatric medication, and he has not demonstrated any symptoms of a serious mental illness that would require such treatment." On August 31, 2012, the court held a competency reconsideration hearing to reassess the defendant's competency to stand trial. At the hearing, Cotterell's report was marked as an exhibit, and defense counsel and the state stipulated that the defendant was competent to stand trial. The court then found that the defendant was competent to stand trial based on Cotterell's report.

On September 26, 2012, the defendant attempted to escape from the custody of the judicial marshals after being brought into the courtroom. When court reconvened after a recess, the defendant was not present. The court indicated that he was "not behaving in any appropriate manner in the lockup," was "spitting at the cell door" and was "giving the correction officers a difficult time . . . ." Defense counsel, who had represented the defendant over the last year, agreed that the defendant "appear[ed] to be in a somewhat agitated state." The court stated that the defendant's next court appearance would be conducted by video conference "to minimize the further potential of any harm to any correction[al] and/or judicial marshal staff." Despite this arrangement, the defendant's behavior prior to the next two court hearings prevented him from participating in those hearings, even via video conference.

Trial commenced on October 9, 2013. When court reconvened after the first morning recess, the court[5] announced that there had been "a major problem with the defendant" because "[h]e decided to flush his jumpsuit down the toilet" and urinated on the floor. The court directed defense counsel to find substitute clothing for him and stated that "if [the defendant] continues to act up, he will have handcuffs put on eventually." The court observed that "[the defendant] has been behaved in the courtroom and I'm not concerned about his behavior in the courtroom." The court further noted that problems arose only when he leaves the courtroom. While the court was discussing the defendant's conduct with defense counsel, the defendant interjected that he was acting out when outside the courtroom "because [the judicial marshals] put handcuffs on me in a—in a secured cell where they ain't supposed to do that." The court admonished the defendant that the judicial marshals were the ones in control, not him, and gave defense counsel an opportunity to speak with the defendant. The jury was then brought back into the court and evidence continued without the defendant being present in the courtroom. Later that morning, after another recess, the court observed that "[the defendant] is back in the courtroom. . . . [He] has been very well behaved in court. And that's what I see and that's what I care about, primarily. So, there has been no problem

in the courtroom itself."

On October 10, 2013, the second day of trial and the final day of evidence, the defendant testified with respect to the escape charge. After defense counsel declined to conduct a redirect examination of the defendant, the defendant interjected: "You're an idiot." The court excused the jury and engaged in the following colloquy with the defendant after he was returned to the defense table:

"The Court: . . . [Y]our last comment was totally gratuitous.

"The Defendant: I'm sorry, ma'am. I'm on frustration, I kind of lost a little control. I apologize. It's kind of hard, you know, to sit there and like, you know.

"The Court: Your apology is accepted. You don't have to go any further. However, do be advised that calling anyone [names], your attorneys, the state's attorney, anyone in the building, that is unacceptable, and if you weren't facing so much, you would be facing a contempt charge. But you did apologize, and it's just not worth even considering the contempt because you are facing so many other serious charges. All right, sir?

"The Defendant: Yes.

"The Court: But thank you for the apology.

"The Defendant: All right."

The jury then was brought back into the courtroom, and the defendant did not make any other comments or cause any additional disruptions. On October 11, 2013, the third and final day of trial, the jury heard closing arguments from counsel and was charged by the court. The defendant did not make any comments or cause any disruptions in court that day. Additional facts will be set forth as necessary.

First, the defendant seeks *Golding* review[6] of his claim that the court violated his purported right to testify at a competency hearing by not canvassing him, sua sponte, on whether he understood that by stipulating to his competency he was waiving his right to testify at a competency hearing. Second, the defendant claims that the court committed plain error by permitting defense counsel to waive the second reconsideration hearing because § 54-56d (k) permits only the accused to waive a reconsideration hearing. Third, the defendant claims that the court violated his due process rights and committed plain error by accepting his stipulation to his competency and by not ordering, sua sponte, an evidentiary hearing to evaluate his competency. Finally, the defendant claims that the court violated his due process rights and committed plain error by failing to order, sua sponte, a nunc pro tunc, or retrospective,[7] competency hearing to evaluate his competency at trial in light of his erratic posttrial conduct, which we discuss in detail later in this opinion. We reject the defendant's claims.

We begin by setting forth the standards of review that will guide our analysis of the defendant's claims. "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Internal quotation marks omitted.) *State* v. *Dixon*, 318 Conn. 495, 511, 122 A.3d 542 (2015). "The first two steps in the *Golding* analysis address the reviewability of the claim, while the last two steps involve the merits of the claim." (Internal quotation marks omitted.) *State* v. *Britton*, 283 Conn. 598, 615, 929 A.2d 312 (2007). "The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Dixon*, supra, 511.

Although *Golding* is a doctrine that parties invoke to obtain review of unpreserved constitutional claims, the plain error doctrine "is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party." *State* v. *Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009). "Plain error is a doctrine that should be invoked sparingly." (Internal quotation marks omitted.) Id. "[An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) Id., 288.

A

The defendant first seeks *Golding* review of his claim that "the trial court *should have* informed [him] of his right to testify [at a competency hearing], and should have canvassed him on that point, *prior to* accepting defense counsel's [competency] stipulation." (Emphasis in original.) The defendant's argument is predicated on the assumption that he has a constitutional right to testify at a pretrial competency hearing, that this is a "personal right" that can be waived only by the defendant, and that only the accused personally can waive a competency hearing as a result. Although we conclude that the defendant's claim is reviewable pursuant to the first and second prongs of *Golding*, the defendant is not entitled to reversal under the third prong of *Golding*

because he has not established that a constitutional violation exists and deprived him of a fair trial.[8]

Assuming, without deciding, that there is a constitutional right to testify at a pretrial competency hearing, the outcome of this case is controlled by *State* v. *Paradise*, 213 Conn. 388, 567 A.2d 1221 (1990), overruled in part on other grounds by *State* v. *Skakel*, 276 Conn. 633, 693, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed 2d 428 (2006). In *Paradise,* our Supreme Court held that the substantive right to testify under federal constitutional law does not contain a corollary procedural requirement that a trial court canvass a defendant concerning his waiver of his right to testify unless the defendant affirmatively states that he wishes to testify or that he did not know he could testify. Id., 404–405; see also *Ghant* v. *Commissioner of Correction*, 255 Conn. 1, 12 and n.10, 761 A.2d 740 (2000) ("the trial court's failure to establish that the petitioner's waiver of his right to testify [by pleading guilty] was knowing, intelligent and voluntary does not constitute a nonfrivolous ground for appeal" in light of *Paradise*); *State* v. *Joyner*, 225 Conn. 450, 482–83, 625 A.2d 791 (1993) (declining to reconsider *Paradise*); *State* v. *Jordan*, 151 Conn. App. 1, 36 and n.11, 92 A.3d 1032 (trial court may, but is not required to, canvass defendant personally as part of its independent inquiry into his competency to stand trial), cert. denied, 314 Conn. 909, 100 A.3d 402 (2014). In the present case, it is undisputed that at the second reconsideration hearing the defendant never affirmatively stated that he wished to testify at the competency hearing or that he did not know that he could testify. Therefore, the court had no duty to canvass the defendant on his purported right to testify at a competency hearing.

The defendant nevertheless urges us to distinguish this case from *Paradise* because we are addressing the purported right to testify at a competency hearing rather than the well established right to testify at trial, which was the subject of *Paradise*. The defendant reasons that inferring a waiver of the purported right to testify at a competency hearing is "illogical, because the defendant (at that point in time) may be 'unable to understand the proceedings against him or her or to assist in his or her own defense.' " Additionally, the defendant argues that a defendant's testimony at a competency hearing can be particularly important because "[t]he defendant's demeanor and behavior in the courtroom can often be as probative on the issue of his competence as the testimony of expert witnesses." (Internal quotation marks omitted.) Although we agree that this case is factually distinguishable from *Paradise*, we conclude that *Paradise* is nevertheless apposite and controlling in this circumstance. Therefore, we decline to address this claim other than to note that "as an intermediate appellate body, we are not at liberty to discard, modify, reconsider, reevaluate or overrule the precedent of our

Supreme Court." (Internal quotation marks omitted.) *State* v. *Elias V.*, 168 Conn. App. 321, 334 n.12, 147 A.3d 1102, cert. denied, 323 Conn. 938,      A.3d      (2016).

B

The defendant also claims that the court erred by permitting defense counsel to stipulate to his competency, and thereby waive the second reconsideration hearing, because § 54-56d (k) permits only the accused to waive a reconsideration hearing. Because the defendant failed to preserve this statutory claim at trial, he seeks reversal pursuant to the plain error doctrine.

The application of the plain error doctrine is "appropriate in matters of statutory construction because the interpretation of [a] statute and the resolution of [the] issue does not require further fact-finding . . . ." (Internal quotation marks omitted.) *State* v. *Myers*, supra, 290 Conn. 288 n.8. Nevertheless, not every statutory error merits reversal under the plain error doctrine. Id., 290 and n.10. "A trial court's failure to comply with a rule of criminal procedure, without more, is insufficient to require reversal for plain error." Id., 290; see also id., 295 (no plain error where "[t]here simply was no constitutional right on which the trial court could have trampled"). That is, even if a defendant establishes that the trial court failed to comply with a rule of criminal procedure, to prevail he must still establish that the claimed error was "*both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) Id., 288. Our Supreme Court has held that a violation of a rule of practice designed to protect constitutional rights is not grounds for reversal when the defendant was not actually deprived of his or her constitutional rights. See, e.g., *State* v. *Sanchez*, 308 Conn. 64, 83–85, 87, 60 A.3d 271 (2013) (reversal under the plain error doctrine not warranted where it was "exceedingly unlikely" that trial court's failure to give sua sponte an eyewitness identification instruction pursuant to *State* v. *Ledbetter*, 275 Conn. 534, 575, 881 A.2d 290 [2005], cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 [2006], harmed the defendant); *State* v. *Myers*, supra, 289–90, 295 (reversal under plain error doctrine not warranted based on trial court's failure to obtain a plea or conduct a trial, in accordance with Practice Book § 42-2, prior to sentencing defendant as a repeat offender because "the defendant . . . failed to raise *any* doubt with respect to the validity of his prior conviction" [emphasis in original]).

In the present case, we conclude that, regardless of the meaning of § 54-56d (k), the defendant has not established that he was deprived of his constitutional rights, or otherwise harmed, by the court's failure to ask him personally whether he wanted to stipulate to his competency, and thereby waive the reconsideration hearing.

Section 54-56d codifies the constitutional standard for legal competency and establishes the procedure for determining whether a defendant is competent to stand trial. *State* v. *Dort*, 315 Conn. 151, 170, 106 A.3d 277 (2014). This statutory scheme includes procedures for initial competency evaluations as well as procedures for determining whether a defendant who has been found incompetent to stand trial has been restored to competency. In particular, subsection (e) of § 54-56d, which governs the initial competency hearing, states in relevant part: "A *defendant and the defendant's counsel* may waive the court hearing only if the examiners, in the written report, determine without qualification that the defendant is competent. . . ." (Emphasis added.) By contrast, subsection (k), which governs competency reconsideration hearings, states in relevant part: "The [reconsideration] hearing may be waived *by the defendant* only if the report indicates that the defendant is competent. . . ." (Emphasis added.)

The defendant argues that because "the word 'defendant' as used in subsection (e) refers to the accused person rather than his 'counsel,' the use of the word 'defendant' in subsection (k) obviously has the same meaning." Nevertheless, assuming arguendo that the distinction noted by the defendant is meaningful and that the court then failed to comply strictly with § 54-56d (k), the record in this case does not establish that the court's failure deprived the defendant of his constitutional rights or otherwise harmed him. The purpose of § 54-56d is to ensure that the defendant is not tried, convicted, or sentenced while legally incompetent, and the defendant has not established that he was tried and convicted while legally incompetent. For all of the reasons discussed in part I C of this opinion, we conclude that the defendant has failed to establish that the court violated his constitutional rights by finding him competent to stand trial at the second reconsideration hearing. Similarly, for all the reasons discussed in part I D of this opinion, we conclude that the defendant has failed to establish that there was a reasonable doubt during trial that he was competent.

Therefore, because the defendant has failed to establish that this purported procedural error was "so harmful that a failure to reverse the judgment would result in manifest injustice," he has failed to meet the exacting standard for reversal under the plain error doctrine. (Internal quotation marks omitted.) *State* v. *Myers*, supra, 290 Conn. 289.

C

The defendant next seeks *Golding* and plain error review of his claim that the court erroneously found him competent to stand trial at the second reconsideration hearing based on the third competency report. Specifically, the defendant argues that the court should have

conducted an evidentiary hearing to explore "the troubling question of how the defendant's mental health diagnosis and treatment could change so drastically between the first competency hearing and the final reconsideration hearing." The state responds that the court was not required to conduct an evidentiary hearing because the third competency report, which was uncontested, provided ample evidence that the defendant was competent to stand trial. We conclude that although the defendant's claim is reviewable under the first and second prongs of *Golding*, the defendant is not entitled to reversal under the third prong of *Golding* or the plain error doctrine because he failed to establish that the court's finding of competency at the second reconsideration hearing violated his constitutional rights or constitutes a manifest injustice requiring reversal.

"The standard we use to determine whether a defendant is competent under state law to stand trial . . . is whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." (Citations omitted; internal quotation marks omitted.) *State* v. *Dort*, supra, 315 Conn. 170; accord General Statutes § 54-56d (a) ("a defendant is not competent if the defendant is unable to understand the proceedings against him or her or to assist in his or her own defense"); *Drope* v. *Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975) (a defendant is not competent if his "mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense"). Our courts have a "constitutional obligation, under the due process clause, to undertake an independent judicial inquiry . . . into a defendant's competency to stand trial . . . whenever [there exists] specific factual allegations that, if true, would constitute substantial evidence of mental impairment. . . . Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency. . . . The trial court should carefully weigh the need for [an evidentiary] hearing in each case, but this is not to say that it should be available on demand. The decision to grant a hearing requires the exercise of sound judicial discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Dort*, supra, 170–71.

The thrust of the defendant's argument is that because the court knew that he had been diagnosed previously with psychiatric conditions and prescribed

psychiatric medications, it was required to hold an evidentiary hearing to explore "the dramatic change in the defendant's diagnosis and the total cessation of medication." As a threshold matter, it is important to emphasize that mental illness is not the legal equivalent of incompetency. *State* v. *DeAngelis*, 200 Conn. 224, 230, 511 A.2d 310 (1986) ("Competence to stand trial, however, is not defined in terms of mental illness. An accused may be suffering from a mental illness and nonetheless be able to understand the charges against him and to assist in his own defense . . . ."); see also *Drope* v. *Missouri*, supra, 420 U.S. 180 ("[t]here are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed"). "The touchstone of competency, rather, is the ability of the defendant to understand the proceedings against him and to assist in his own defense." *Taylor* v. *Commissioner of Correction*, 284 Conn. 433, 452, 936 A.2d 611 (2007).

In the present case, the court found that the defendant was competent to stand trial based on the third competency report, in which Cotterell described in detail the aspects of the defendant's behavior that indicated that he had a capacity to understand the nature of the proceedings against him and to assist in his own defense. For example, in the conclusions and recommendations section of the report, Cotterell described how the defendant, inter alia, "is able to pay attention to his environment . . . and the rules of his status. . . . He is able to communicate when he wants, and he can use appropriate vocabulary and grammar. He can listen to what others tell him and understand routine instructions and guidance. . . . His long and short-term memory functions are intact. If he wants something, he can make a plan to get it and then carry out that plan. He can show initiative if he is sufficiently motivated. He is able to work with others when he perceives that he will receive a benefit from that interaction. . . . He can and does pay attention to what is going on around him. . . . He can bring information or requests to the attention of others. . . . He knows what he wants and he can identify things that would help him to improve his situation. Sometimes, he makes choices that are maladaptive, immature, and impulsive. However, he is always aware of his options, even if he chooses unwisely."

Cotterell also explained that some of the negative aspects of the defendant's presentation were due to the defendant malingering to avoid the consequences of his legal situation.[9] This was not an unexpected diagnosis either; the prior competency reports also intimated that the defendant might be malingering. For example, the first and second competency reports noted that while incarcerated the defendant had a habit of threatening suicide or engaging in self-injurious or bizarre behavior in an attempt to change his placement to a more desir-

able housing block. The first competency report, while concluding that the defendant's behavior during interviews was indicative of psychiatric issues, also acknowledged that "there was a volitional element to his refusal to participate in the interview process." Similarly, the second competency report observed that there was a "volitional component to [the defendant's] presentation" and that "[i]t appears that [the defendant] knows more than he is willing to admit."[10] According to the second competency report, the defendant's behavior "suggested that he was trying to find a way to avoid facing the implications of his charges." Cotterell's conclusion in the third competency report that the defendant was both competent to stand trial and malingering, therefore, was not as dramatic and inexplicable as suggested by the defendant.

Finally, at the second reconsideration hearing, defense counsel, who originally moved to have the defendant's competency evaluated, did not contest the findings of the third competency report or express any concerns about his client's competency to stand trial. See *State* v. *Ouellette*, 271 Conn. 740, 754, 859 A.2d 907 (2004) ("[a]lthough it is true that the defendant required treatment to restore him to competency, at no time after the evaluation team rendered its conclusion that the defendant was competent did defense counsel, the state or the trial court express any concern whatsoever about the defendant's competence"); *United States* v. *Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) ("A failure by trial counsel to indicate that the defendant had any difficulty in assisting in preparation or in comprehending the nature of the proceedings 'provides substantial evidence of the defendant's competence.' ").

In sum, based on the totality of the information before the court at the second reconsideration hearing, we conclude that there was an adequate factual basis for the court to determine that the defendant was competent to stand trial. Additionally, we conclude that the court was not required to conduct an evidentiary hearing at the second reconsideration hearing because there was not substantial evidence that the defendant still lacked legal capacity. Therefore, the defendant has failed to meet the third prong of *Golding* as well as the stringent standard for relief pursuant to the plain error doctrine.

D

Finally, the defendant seeks *Golding* and plain error review of his claim that the court violated his due process rights by failing to order, sua sponte, a nunc pro tunc competency hearing to evaluate his competency at trial in light of his posttrial conduct between December, 2013 and April, 2014.[11] We conclude that the defendant is not entitled to reversal under *Golding* or the plain error doctrine because he has not established that the court's failure to order, sua sponte, a nunc pro tunc

competency hearing violated his constitutional rights or constitutes a manifest injustice requiring reversal.

The following additional facts are relevant to this claim. On December 12, 2013, the defendant was scheduled for sentencing. When court opened that day, the court observed the defendant's absence. A judicial marshal then explained that while the defendant was being transported to the courthouse, "he defecated on himself in the back of the transport van" and was, therefore, transported back to the correctional facility. The court and counsel decided to proceed with the hearing on the defendant's posttrial motions and to reschedule the defendant's sentencing. After the court heard argument on, and denied, the defendant's motion for a new trial and motion to vacate, defense counsel moved to have the defendant evaluated pursuant to General Statutes § 17a-566.[12] Defense counsel explained that he and cocounsel had visited the defendant the prior week, at which time the defendant "exhibited certain behaviors, which concerned us . . . ."[13] Specifically, defense counsel stated that the defendant had "made certain statements," that he "had a different presentation than he did during the trial," and that his "psychiatric condition appears to be more prevalent than it did at times during the trial . . . ." The court granted defense counsel's motion and ordered that the defendant be evaluated.

On January 13, 2014, the clinical team informed the court that they had attempted to evaluate the defendant on two occasions but he had refused to meet with them. The defendant was present at the next court hearing on January 31, 2014. When the court explained to the defendant that a competency evaluation had been ordered, the defendant initially seemed confused about what the court was saying, but ultimately he agreed to participate in a competency evaluation.[14]

On February 28, 2014, the court held a hearing concerning a motion to quash a subpoena for the defendant's mental health records, which was filed on behalf of the Department of Mental Health and Addiction Services. The court denied the motion because the defendant had waived his confidentiality in the records at the prior hearing. See footnote 14 of this opinion. The court stated that while the defendant "does have some form of a mental disability," it was "not sure that it's a competency disability." The court entered another order for a competency evaluation of the defendant. While discussing the appropriate continuance date with counsel, the defendant interjected and the following exchange occurred:

"The Defendant: I'll plead guilty of all charges. How's that?

"The Court: You've already had a trial, sir. You've already been found guilty of all charges.

"The Defendant: Well, I plead guilty all over again.

"The Court: I don't think you—

"The Defendant: Have this conversation?

"The Court: —can plead guilty after you've been found guilty.

"The Defendant: Oh, yes I could if you're going the speed of light, you can.

"The Court: Well, you've already been found guilty by a jury and all we have to do now is sentence you, sir. And if you want to agree to the sentence, that's one thing. But I don't think—

"The Defendant: Yes, I agree to the sentence.

"The Court: I don't think you're going to agree to the sentence the state wants.

"The Defendant: Why it doesn't make sense because you're on that side and I'm on this side.

"The Court: That's the way it works here. All right. So, we're going to have the 22nd of April, correct?

"[The State's Attorney]: The 22nd of April, that's fine.

"The Court: Yes.

"[The State's Attorney]: That's fine with the state.

"The Court: Thank you.

"The Defendant: I want to save my nuts before anything.

"The Court: It's too late to plead. The jury's already found you guilty, sir. We are adjourned. Thank you."

On April 23, 2014, Cotterell submitted a competency report, in which he concluded that the defendant "does not at this time have a serious mental disease or defect that necessitates further placement at [a treatment facility]," and recommended that the defendant "be sentenced in accordance with his conviction." The defendant did not challenge Cotterell's report and was sentenced on April 28, 2014. During the sentencing hearing, the defendant engaged in argumentative behavior. As the court imposed the defendant's sentence, the defendant's interruptions and insults escalated. Eventually, the court ordered him to be removed from the courtroom, found him in contempt of court, and sentenced him for his contempt.[15]

It is well established that "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." (Internal quotation marks omitted.) *State* v. *Johnson*, 253 Conn. 1, 21, 751 A.2d 298 (2000). "[W]hen a reasonable doubt concerning the defendant's competency is raised, the

trial court must order a competency examination." (Internal quotation marks omitted.) Id. In certain circumstances, a court may even be required to hold a nunc pro tunc competency hearing to ensure that the defendant was competent during an earlier proceeding. Nevertheless, in general, nunc pro tunc competency determinations are disfavored because there is often a risk that the post hoc reconstruction of the defendant's mental state will be unduly speculative and inherently unreliable. See *Drope* v. *Missouri*, supra, 420 U.S. 183 (noting inherent difficulties of nunc pro tunc competency determinations under even the most favorable circumstances); *Pate* v. *Robinson*, 383 U.S. 375, 387, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966) (same); *Dusky* v. *United States*, 362 U.S. 402, 403, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (same); *Gold* v. *Warden*, 222 Conn. 312, 317–18 and n.9, 610 A.2d 1153 (1992) (same); *State* v. *Snook*, 210 Conn. 244, 253, 555 A.2d 390 (same), cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989).

"The touchstone of competency . . . is the ability of the defendant to understand the proceedings against him and to assist in his own defense." *Taylor* v. *Commissioner of Correction*, supra, 284 Conn. 452. Therefore, a failure by defense counsel to indicate that the defendant had any difficulty in comprehending the nature of the proceedings or in assisting in his own defense provides substantial evidence of the defendant's competence. *United States* v. *Kirsh*, supra, 54 F.3d 1071; see *State* v. *Dort*, supra, 315 Conn. 172; *State* v. *Ouellette*, supra, 271 Conn. 754. Similarly, "[a] trial court's opinion . . . of the competency of a defendant is highly significant" because "[t]he trial judge is in a particularly advantageous position to observe a defendant's conduct during a trial and has a unique opportunity to assess a defendant's competency." (Internal quotation marks omitted.) *State* v. *Ducharme*, 134 Conn. App. 595, 602, 39 A.3d 1183, cert. denied, 305 Conn. 905, 44 A.3d 181 (2012); see also *State* v. *Ouellette*, supra, 754. Finally, it is significant when the defendant appears to be competent throughout the course of trial. *United States* v. *Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986) ("failure to conduct a full competency hearing is not a ground for reversal when the defendant appears competent during trial"); see *State* v. *Caracoglia*, 95 Conn. App. 95, 108–109, 895 A.2d 810 (holding that defendant was competent to waive right to assistance of counsel because his conduct at trial indicated that he was, in fact, competent to stand trial), cert. denied, 278 Conn. 922, 901 A.2d 1222 (2006).

As a threshold matter, we conclude that the defendant's claim that his due process rights were violated by the court's failure to order sua sponte a nunc pro tunc competency hearing is reviewable under *Golding* because there is an adequate record for review and this claim is of a constitutional magnitude. After careful

review of the record, however, we conclude that the defendant's posttrial conduct did not create a reasonable doubt, in hindsight, as to his competency at trial. Thus, the court was not obligated to order sua sponte a nunc pro tunc competency hearing to reevaluate the defendant's competency at trial. Therefore, because the defendant has not established that the court's failure to order, sua sponte, a nunc pro tunc competency hearing violated his due process rights or constitutes a manifest injustice requiring reversal, he is not entitled to reversal under *Golding* or the plain error doctrine.

Our conclusion is first based on the fact that defense counsel, who represented the defendant for approximately two years and previously had sought competency evaluations for the defendant, never raised concerns about his client's competency *to stand trial* after he was found to be competent at the second reconsideration hearing. Defense counsel did raise concerns about the defendant's competency *to be sentenced* when the defendant's presentation became more argumentative posttrial. Notably, when defense counsel moved for a competency hearing posttrial, he supported that motion by highlighting the difference between the defendant's presentation *posttrial* and his presentation *at trial*. Specifically, after the defendant's conduct prevented him from being transported to the courthouse on December 12, 2013, defense counsel observed that the defendant had "had a different presentation than he did during the trial" and the defendant's "psychiatric condition appears to be more prevalent than it did at times during the trial . . . ."

It is also significant that during the trial the court did not voice any concerns about the defendant's competency to stand trial. Quite to the contrary, the court expressly stated that it was "not concerned about his behavior in the courtroom" and observed that "[the defendant] has been very well behaved in court."

Finally, it is significant that during the trial, the defendant appeared to be competent. We acknowledge that the defendant engaged in disruptive behavior on two occasions during trial, but neither the defendant's behavior nor his responses to the court's admonitions indicated a lack of competency. On the first day of trial, the defendant flushed his jumpsuit down the toilet and urinated on the floor. When asked by the court about this behavior, he was able to articulate why he acted that way—i.e. because the courtroom marshals "put handcuffs on me in a—in a secured cell where they ain't supposed to do that." On the second day of trial, the defendant was again disruptive when he called defense counsel "an idiot" for not conducting a redirect examination of him. When the court admonished the defendant for his comment, however, he responded appropriately by recognizing that "[he] kind of lost a little control" and by apologizing for his remark.

Although the defendant's conduct at trial might be reflective of the impulsivity described by Cotterell, it does not indicate a lack of competency.

In sum, there was significant evidence at trial that the defendant was competent. The defendant's posttrial conduct did not call into question any of this contemporaneous evidence of competency. As defense counsel observed, the defendant's presentation during and after trial was different. Therefore, because the defendant has not established that the court's failure to order sua sponte a nunc pro tunc competency hearing violated his due process rights or constitutes a manifest injustice requiring reversal, we conclude that he is not entitled to reversal under *Golding* or the plain error doctrine.

## II

We next address the defendant's claims concerning the consolidation of the sexual assault information and the escape information for trial. First, the defendant claims that the court abused its discretion by granting the state's motion for consolidation because the evidence relating to each information was not fully cross admissible and a *Boscarino* factor[16] was present. Second, the defendant claims that the court unduly burdened his constitutional right to remain silent in the sexual assault case by joining that case, in which he did not testify, with the escape case, in which he did testify. We reject the defendant's claims.[17]

The following additional facts are relevant to these claims. On September 19, 2013, five days before the start of jury selection, the defendant filed an anticipatory objection to joinder of informations for trial and the state filed a revised motion for consolidation.[18] In the revised motion to consolidate, the state argued that the evidence in the two cases was cross admissible[19] and that no *Boscarino* factors were present. In his anticipatory objection to the state's motion, the defendant argued that the motion to consolidate was untimely and that joinder would substantially prejudice his right to a fair trial, including his decision as to whether to testify. On September 23, 2013, the court held a hearing at which it addressed the state's motion to consolidate. On September 24, 2013, the court granted the state's motion.

### A

The defendant claims that the court abused its discretion by joining the sexual assault information and escape information for trial because the evidence was not cross admissible and a *Boscarino* factor was present in his trial. We disagree.

We begin our analysis with a review of the law governing pretrial motions for joinder pursuant to Practice Book § 41-19. "[I]n deciding whether to [join informations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate

court may not disturb. . . . [W]hen charges are set forth in separate informations, presumably because they are not of the same character, and the state has moved in the trial court to join the multiple informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. . . . On appeal, however, the burden shifts to the defendant to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Crenshaw*, 313 Conn. 69, 83, 95 A.3d 1113 (2014).

Substantial prejudice "means something more than that a joint trial will be less than advantageous to the defendant," and it requires the defendant to "[show] that any prejudice from joinder may be beyond the curative power of the court's instructions." (Internal quotation marks omitted.) *State* v. *Chance*, 236 Conn. 31, 51, 671 A.2d 323 (1996). When resolving whether a defendant was substantially prejudiced, we consider whether the evidence was cross admissible and whether any of the *Boscarino* factors were present. *State* v. *Crenshaw*, supra, 313 Conn. 83. When "the evidence would have been cross admissible in different trials . . . we need not determine whether any of the *Boscarino* factors was present." Id., 83. "[When] evidence of one incident can be admitted at the trial of the other [incident], separate trials would provide the defendant [with] no significant benefit. . . . [U]nder such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Internal quotation marks omitted.) Id., 83–84; see, e.g., *State* v. *Atkinson*, 235 Conn. 748, 765, 670 A.2d 276 (1996) (defendant was not substantially prejudiced by joinder of murder charge and escape charge where evidence concerning the escape charge would be admissible in a separate murder trial as evidence of consciousness of guilt). "When evidence is not cross admissible, several factors identified in *State* v. *Boscarino*, 204 Conn. 714, 721–24, 529 A.2d 1260 (1987), are used to determine whether the defendant has suffered substantial prejudice. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *Crenshaw*, supra, 83–84 n.8.

With the foregoing legal principles in mind, we first address whether the evidence of the sexual assault and the escape was cross admissible. Evidence is cross admissible for the purposes of joinder when evidence

from one information would be admissible in a separate trial on the other information, and vice versa. In the present case, evidence of the defendant's attempt to escape custody would have been admissible as evidence of consciousness of guilt in a separate trial on the sexual assault information. See *State* v. *Figueroa*, 257 Conn. 192, 196, 777 A.2d 587 (2001) ("[f]light when unexplained, tends to prove a consciousness of guilt" [internal quotation marks omitted]); *State* v. *Atkinson*, supra, 235 Conn. 765 ("[e]vidence concerning the escape charge could properly have been admitted in a separate trial for the murder charge because escape indicates consciousness of guilt"). Likewise, evidence that the defendant was in custody and charged with a felony would have been admissible in a separate trial on the escape information because those are elements of the offense. See General Statutes § 53a-171 ("[a] A person is guilty of escape from custody if such person [1] escapes from custody . . . . [b] If a person has been arrested for, charged with or convicted of a felony, escape from such custody is a class C felony . . . ."). However, the details surrounding the sexual offense charges—i.e. the fact that the defendant lured an eleven year old into his apartment so that he could sexually assault her by vaginal penetration—might not have been admissible in a separate trial on the escape information.[20] See Conn. Code Evid. § 4-3. It is unclear from our Supreme Court's precedent whether evidence must be *fully* cross admissible to permit joinder. Compare *State* v. *Crenshaw*, supra, 313 Conn. 84 ("[w]e consistently have found joinder to be proper if we have concluded that the *evidence of other crimes . . . would have been cross admissible at separate trials*" [emphasis added; internal quotation marks omitted]) with *State* v. *Atkinson*, supra, 765 ("*Where evidence of one incident can be admitted at the trial of the other* [*incident*], separate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." [Emphasis altered; internal quotation marks omitted.]).

Assuming arguendo that the evidence in the two cases must be fully cross admissible and was not in this case, we next address whether any of the *Boscarino* factors were present at the consolidated trial. See *State* v. *Crenshaw*, supra, 313 Conn. 83 n.8. The defendant argues that the second *Boscarino* factor was present at his consolidated trial and he suffered substantially prejudice in the sexual assault case as a result.[21] In particular, he argues that "[o]nce the cases were joined, the jury was more likely to conclude (based on evidence of the attempt to escape)[22] that the defendant was prone to physical violence and thus more likely to have used physical force in committing an 'aggravated' sexual assault of a minor." (Footnote added.) The defendant's analysis misapplies the second *Boscarino* factor. The

second *Boscarino* factor focuses on whether the brutal or shocking nature of the defendant's conduct *in one case* might compromise the jury's ability to consider fairly the charges against him *in the other case. State v. Boscarino*, supra, 204 Conn. 723. In the present case, it is undisputed that the defendant's attempt to escape was not of a brutal or shocking nature capable of compromising the jury's ability to consider fairly the charges against him in the sexual assault case.[23]

Moreover, the defendant's analysis also overlooks the fact that at the time the state filed its motion for consolidation, neither the parties nor the court knew that the victim would testify that the defendant used some physical force to sexually assault her.[24] When reviewing a trial court's pretrial decision to join cases we focus on the trial court's understanding of what evidence *could* be presented at trial, not what evidence was *actually* presented at trial.[25] The record reveals that at the time the state filed its motion to consolidate, the primary basis for the sexual offense charges was the age difference between the defendant and the victim and the fact that the defendant used *deception* to lure the victim to his apartment.[26] The state did not intend to, nor did it need to, present evidence of physical force to prove "aggravated" sexual assault of a minor. Thus, it was reasonable for the court to conclude that any risk that the jury would improperly consider evidence that the defendant used some physical force in his attempt to escape in its deliberations on the aggravated sexual assault of a minor charge could be cured with a proper limiting instruction. See *State* v. *Chance*, supra, 236 Conn. 38.

"[W]hether a joint trial will be substantially prejudicial to the defendant's rights means something more than that it will be less advantageous to [him]." (Internal quotation marks omitted.) *State* v. *Perez*, 147 Conn. App. 53, 98 n.42, 80 A.3d 103 (2013), aff'd, 322 Conn. 118, 139 A.3d 654 (2016); accord *State* v. *Chance*, supra, 236 Conn. 51–52. Because the defendant has failed to establish that he was substantially prejudiced by a consolidated trial, we conclude that the court did not abuse its discretion by granting the state's motion to consolidate.

### B

The defendant's final claim concerning the consolidation of the informations for trial is that the court violated his right to remain silent, as guaranteed by the fifth and fourteenth amendments to the federal constitution,[27] by denying his motion for a new trial after he testified as to the escape charge but remained silent as to the sexual assault charges. Specifically, the defendant argues that "the improper joinder effectively undermined [his] valued right to remain silent—more precisely, his right to insure that no adverse inferences were drawn from the exercise of that constitutional privilege." We disagree.

The following additional facts are relevant to this claim. On September 19, 2013, the defendant filed an anticipatory objection to the state's motion to consolidate, in which he argued, inter alia, that joinder would substantially prejudice his right to a fair trial, including his decision to testify. On September 23, 2013, the court held a hearing concerning the state's motion to consolidate. At that hearing, the defendant never addressed how joinder would affect his decision to testify as to the sexual assault charges or the escape charges. Trial commenced on October 9, 2013. In its preliminary instructions to the jury, the court explained that the trial would involve "two separate informations" that had been "consolidated for purposes of the trial only." The court further emphasized that the two informations must be considered separately. That day, the state presented evidence pertaining only to the sexual assault charges.

At the start of the second day of trial, the court reminded the jurors that "there are two separate sets of factors that are being considered, two separate informations" and that they were "still receiving information concerning the first set, the allegations of what happened" at the location where the victim was sexually assaulted. After presenting the testimony of two more witnesses, the state rested in the sexual assault case. The court then reminded the jurors that "the defendant in this case is charged in two separate informations" and that "the state just concluded the evidence on the first information . . . ." The court further reiterated that "[t]he fact that the cases were consolidated for trial does not mean anything other than they were consolidated for trial. It's the same defendant in both. And . . . the defendant is entitled to and has to be given separate consideration for each." The jury was then excused for a recess.

When court resumed, the court asked the defendant outside the presence of the jury whether he would be testifying "for the first case." The defendant responded that he would not, and the court canvassed the defendant on his election not to testify. The jury then reentered the courtroom, and the defense rested as to the sexual assault case. When the parties were ready to proceed with the escape case, the court reminded the jurors that "this is a separate count" and that the evidence being presented related to only the second information. After the state called two judicial marshals as witnesses and had an evidentiary stipulation read to the jury, it rested. The defendant then indicated that he wished to testify concerning the escape case, and the court canvassed the defendant concerning that decision. The defendant did not renew his objection to the consolidation of the cases for trial based on his decision to testify as to the escape charge but not the sexual assault charges. After the defendant testified concern-

ing the escape charge, the defense rested.

On October 11, 2013, the court charged the jury. Throughout the charge, the court emphasized that the trial consisted of two separate informations that had been "consolidated for the convenience of trial," and that "the defendant is entitled to and must be given . . . a separate and independent determination of whether he is guilty or not guilty as to each of the counts." Concerning the defendant's decision to testify concerning the escape charge but not the sexual assault charges, the court gave the following instruction: "There are two separate sets of allegations, the [sexual assault] charges and the [escape] charges. The defendant has not testified in the [sexual assault] case. An accused person has the option to testify or not to testify at the trial. He is under no obligation to testify and he has a constitutional right not to testify. You must draw no unfavorable inferences from the defendant's choice not to testify, that is with reference to the [sexual assault] charges."

After his conviction, the defendant filed a motion for a new trial based, in part, on the consolidation of the two cases. On December 12, 2013, the court held a hearing on the defendant's motion for a new trial. At that hearing, the defendant argued that the consolidation of the cases "impacted [his] testimony in a negative way" because "there is at least a possibility that one or more of the jurors held it against [him] for not testifying on that second trial."

"It long has been recognized that joinder of unrelated criminal charges can cause [substantial] prejudice when it 'embarrasses or confounds an accused in making his defense.' " *State* v. *Perez*, 322 Conn. 118, 134, 139 A.3d 654 (2016). However, "[substantial] prejudice will not invariably result from a decision to testify selectively. Consequently, [a]n accused's election to testify on some but not all of the charges on trial does not automatically require a severance. . . . Rather, the matter remains within the trial court's discretion . . . ." (Citation omitted; internal quotation marks omitted.) Id., 135. "[N]o need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and [a] strong need to refrain from testifying on the other. In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of economy and expedition in judicial administration against the defendant's interest in having a free choice with respect to testifying." (Internal quotation marks omitted.) Id., 135–36. On appeal, the defendant bears the burden of proving that joinder substantially preju-

diced his right to remain silent. See *State* v. *Crenshaw*, supra, 313 Conn. 83. "[T]his means something more than that a joint trial [was] less than advantageous to the defendant," and it requires the defendant to "[show] that any prejudice from joinder may be beyond the curative power of the court's instructions." (Internal quotation marks omitted.) *State* v. *Chance*, supra, 236 Conn. 51; accord *State* v. *Perez*, supra, 134–35.

In the present case, the defendant has failed to show that the consolidation of the two cases for trial substantially prejudiced his right to remain silent. The jurors were certainly aware that the trial consisted of two separate and distinct cases that were joined only for judicial economy. They were also undoubtedly aware that they must consider those cases in a separate and distinct manner. Indeed, the court expressly instructed the jurors that they could not commingle the evidence from the two cases or draw an unfavorable inference from the defendant's decision not to testify as to the sexual assault charges. It is well established that "[t]he jury is presumed, in the absence of an indication to the contrary, to have followed the instructions of the trial court." (Internal quotation marks omitted). *State* v. *Chance*, supra, 236 Conn. 51.

Therefore, we conclude that the defendant has failed to establish that he was substantially prejudiced by the consolidation of the sexual assault information and escape information for trial.

### III

The defendant next seeks *Golding* review of his claim that the court violated his rights under the fourth amendment to the United States constitution by denying his motion to suppress evidence obtained during a search of his apartment.[28] We conclude that the defendant's claim is unreviewable under the first prong of *Golding* because the record is inadequate for review.

The following additional facts are relevant to this claim. On August 31, 2011, officers searched the defendant's apartment with his written consent. At the time the defendant gave his consent for the search, he was being detained for investigative purposes. He was not given *Miranda* warnings[29] prior to giving consent. During the search of the defendant's apartment, officers found a small packet of lubricant in the trash in the defendant's bathroom and a corner piece of foil that had been torn from the packet of lubricant in the defendant's bedroom.

On September 19, 2013, the defendant filed a motion to suppress "any and all statements alleged to have been made by the defendant to or in the presence of any law enforcement authorities and to further suppress all evidence, tangible and intangible, obtained directly or indirectly derived from said statements." On October 7, 2013, the court conducted an evidentiary hearing

regarding the defendant's motion to suppress. At the hearing, the defendant argued, inter alia, that the officers violated his right against self-incrimination under the fifth amendment to the United States constitution by asking him to sign the consent to search form while in custody. The defendant reasoned that the officers' request for consent constituted an "interrogation" for the purposes of *Miranda* because "the police should [have known] that asking [the defendant] to sign [the consent to search] form [was] reasonably likely to elicit an incriminating response."[30] Although the defendant cited the fourth amendment in his motion to suppress, he did not make any substantive arguments that suppression was required under the fourth amendment in that motion or at the evidentiary hearing.

On October 8, 2013, the court orally denied the defendant's motion to suppress. On October 9, 2013, the first day of trial, the court memorialized its ruling briefly on the record during a recess. In relevant part, the court stated: "There was a motion to suppress that was filed by defense counsel and I'd given an oral ruling yesterday that the motion to suppress was denied. There was consent for the apartment search." The remainder of the court's brief oral ruling addressed its denial of the motion to suppress with respect to the buccal swab taken from the defendant with his consent. The court concluded its oral ruling by stating: "I will put this all in writing." The court, however, did not issue a written memorandum of decision. After the defendant's convictions, the defendant renewed his original suppression claim in his motion for a new trial, which the court denied.

On appeal, the defendant now claims that the court violated his rights under the fourth amendment by denying his motion to suppress. Specifically, the defendant claims that the fourth amendment requires law enforcement to provide *Miranda* warnings before obtaining consent to search from an individual that is in custody. Alternatively, the defendant claims that he did not knowingly and voluntarily consent to the search of his apartment. Because the defendant failed to preserve his fourth amendment claim, he seeks *Golding* review.

"The first *Golding* requirement is that the record be adequate to review the alleged claim of [constitutional] error . . . . The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." (Citation omitted; internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 443–44, 988 A.2d 167 (2009).

Although the court orally denied the defendant's

motion to suppress, it did not issue a written memorandum of decision or sign the transcript of its oral decision, pursuant to Practice Book § 64-1 (a). "While we do not condone the court's failure to comply with [Practice Book § 64-1 (a)], and would decline in most instances to search the transcript to ascertain the factual basis in support of the trial court's ruling, we would not [ordinarily] exalt form over substance if the deficiency were of a technical nature." (Internal quotation marks omitted.) *State* v. *Beliveau*, 52 Conn. App. 475, 480, 727 A.2d 737, cert. denied, 249 Conn. 920, 733 A.2d 235 (1999). In the present case, however, the inadequacy of the record is not of a technical nature. The record is devoid of any specific factual findings by the court concerning its ruling on the defendant's motion to suppress. Although the court stated that "[t]here was consent for the apartment search," the defendant did not contest the validity of his consent in his motion to suppress or at the suppression hearing. "[I]t is well established that as an appellate tribunal, we do not find facts." *State* v. *Daly*, 111 Conn. App. 397, 400, 960 A.2d 1040 (2008), cert. denied, 292 Conn. 909, 973 A.2d 108 (2009). It is not this court's role to make a determination, sua sponte, of whether the defendant's consent to search was knowing and voluntary and when, if ever, the defendant received *Miranda* warnings. It is only for this court to decide "whether [the legal conclusions of the trial court] are legally and logically correct and whether they find support in the facts set out in the memorandum of decision [or the signed transcript of the oral ruling] . . . ." *State* v. *Jenkins*, 298 Conn. 209, 222, 3 A.3d 806 (2010).

Therefore, because any decision made by us concerning the validity of the defendant's consent to search would be entirely speculative without the necessary factual and legal conclusions furnished by the trial court, it is unreviewable under the first prong of *Golding*. *State* v. *Duteau*, 68 Conn. App. 248, 254, 791 A.2d 591 (record inadequate for review of fourth amendment suppression claim where trial court did not issue memorandum of decision, sign the transcript, or make specific factual findings concerning issues on appeal), cert. denied, 260 Conn. 939, 835 A.2d 58 (2002); *State* v. *Rios*, 30 Conn. App. 712, 715–16, 622 A.2d 618 (1993) (same); see *State* v. *Beliveau*, supra, 52 Conn. App. 481–82 (fifth amendment claim); see also *State* v. *Young*, 76 Conn. App. 392, 409, 819 A.2d 884 (record inadequate to review of motion to suppress in-court identification where trial court did not issue a memorandum of decision, sign the transcript, or "make any findings whatsoever regarding the suggestiveness of the arraignment proceedings"), cert. denied, 264 Conn. 912, 826 A.2d 1157 (2003).

IV

The defendant's final claim on appeal is that the trial

court improperly denied his motion to vacate on the ground that his convictions and cumulative sentences for the three sexual offenses violated his right against double jeopardy, as guaranteed by the fifth and fourteenth amendments to the United States constitution.[31] Specifically, the defendant argues that because sexual assault in the first degree and risk of injury to a child are the "same offense" as aggravated sexual assault of a minor, his convictions for sexual assault in the first degree and risk of injury should have been vacated prior to sentencing. The state responds that, although sexual assault in the first degree and risk of injury are factually and legally the same offense as aggravated sexual assault of a minor in the present case, they are not the "same offense" for the purposes of double jeopardy because the legislature intended to authorize cumulative punishments for individuals convicted of aggravated sexual assault of a minor and the charged predicate offense(s). We agree with the defendant that his cumulative convictions and sentences for aggravated sexual assault of a minor, sexual assault in the first degree, and risk of injury to a child violates double jeopardy.

A

We begin our analysis by addressing the defendant's claim that sexual assault in the first degree and risk of injury to a child are the "same offense" as aggravated sexual assault of a minor for double jeopardy purposes.

The double jeopardy clause "prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense in a single trial. . . . Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . Traditionally we have applied the *Blockburger* test[32] to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (Footnote added; internal quotation marks omitted.) *State* v. *Gonzalez*, 302 Conn. 287, 315–16, 25 A.3d 648 (2011). "In conducting this inquiry, we look only to relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Palmer*, 206 Conn. 40, 52, 536 A.2d 936 (1988).

In the present case, it is undisputed that the sexual offenses arose out of the same transaction, i.e. the sexual assault of the victim on August 31, 2011. It is also

undisputed that sexual assault in the first degree and risk of injury to a child are legally the "same offense" as aggravated sexual assault of a minor under the *Blockburger* test when, as here, they are charged as predicate offenses for aggravated sexual assault of a minor.[33] See *State* v. *Greco*, 216 Conn. 282, 292, 579 A.2d 84 (1990) (holding that first degree robbery and first degree burglary are the "same offense" as felony murder under the *Blockburger* test when the felony murder count alleges "robbery and burglary" as predicate offenses).

Our inquiry continues, however, as "the *Blockburger* test creates only a rebuttable presumption of legislative intent, [and] the test is not controlling when a contrary intent is manifest." (Internal quotation marks omitted.) *State* v. *Bernacki*, 307 Conn. 1, 23, 52 A.3d 605 (2012), cert. denied, U.S. , 133 S. Ct. 1804, 185 L. Ed. 2d 811 (2013). The "[d]ouble jeopardy protection against cumulative punishments is only designed to ensure that the sentencing discretion of the courts is confined to the limits established by the legislature. . . . Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the same conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial. . . . The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent. . . . The language, structure and legislative history of a statute can provide evidence of this intent." (Citations omitted; internal quotation marks omitted.) *State* v. *Greco*, supra, 216 Conn. 293; accord *Missouri* v. *Hunter*, 459 U.S. 359, 368, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983) (stating that the *Blockburger* test "is not a constitutional rule requiring courts to negate clearly expressed legislative intent").[34]

In the present case, the burden is on the state to rebut the presumption created under the *Blockburger* test that aggravated sexual assault of a minor is the same offense as sexual assault in the first degree and risk of injury to a child for the purposes of double jeopardy. *State* v. *Alvaro F.*, 291 Conn. 1, 13 n.14, 966 A.2d 712, cert. denied, 558 U.S. 882, 130 S. Ct. 200, 175 L. Ed. 2d 140 (2009). In particular, the burden is on the state to present evidence of clear legislative intent to specifically authorize cumulative punishments for a conviction under § 53a-70c and the underlying predicate offense(s). If this court concludes that it is ambiguous whether the legislature intended to authorize cumulative punishments, the state cannot prevail. See *State* v. *Wright*, 319 Conn. 684, 692 n.3, 127 A.3d 147 (2015).

When divining legislative intent in the double jeopardy context, our Supreme Court has considered several factors, including: (1) whether the statutes were "designed to protect separate and distinct interests of society"; (internal quotation marks omitted) *State* v. *Bernacki*, supra, 307 Conn. 29; see also *State* v. *Greco*, supra, 216 Conn. 295–96; (2) whether the statute in question references other statutory offenses; *State* v. *Greco*, supra, 294–95; (3) whether the statute in question "set[s] forth a separate penalty rather than using a multiplier of the penalty for another offense"; id., 294; (4) the presence of language expressly prohibiting cumulative punishments; id., 295; (5) the placement of each offense within the General Statutes; *State* v. *Braswell*, 42 Conn. App. 264, 271, 679 A.2d 407 (1996), appeal dismissed, 243 Conn. 248, 701 A.2d 1057 (1997); and (6) the legislative history of the challenged statute; *State* v. *Greco*, supra, 296–97.

In the present case, the statutes at issue are designed to protect the same interests of society; each of the charged statutory provisions strives to protect children from inappropriate sexual contact. Section 53a-70c in particular furthers this purpose by enabling the state to seek enhanced, mandatory penalties for sexual offenders of children when the victim is under the age of thirteen and an enumerated aggravating factor is present.[35] Cf. *State* v. *Greco*, supra, 216 Conn. 296–98 (holding that robbery and burglary are not the "same offense" as felony murder even when they are charged as predicate offenses because each offense has a distinct statutory purpose: "An obvious purpose of the felony murder statute, or any murder statute, is to protect human life. . . . In contrast, [t]he basic rationale [of the robbery statutes] is protection against the terror of the forcible taking . . . while the primary rationale of the crime of burglary is protection against invasion of premises likely to terrorize occupants." [Citations omitted; internal quotation marks omitted.]).

The state responds that "while these statutes may be 'closely linked,' the overlap is 'not determinative' because the harms targeted [by these statutes] . . . 'do not necessarily coexist' in every case." The state analogizes this case to *State* v. *Wright*, supra, 319 Conn. 684. In *Wright*, our Supreme Court addressed whether the double jeopardy clause prohibited a defendant from being convicted and sentenced for two counts of aggravated sexual assault of a minor, which arose from the same transaction but charged different subsections of § 53a-70c. Id., 685–86. It was undisputed in *Wright* that the two counts were factually and legally distinct offenses, and, therefore, that the burden was on the defendant to rebut the *Blockburger* presumption. Id., 690–92. In concluding that the defendant failed to rebut the *Blockburger* presumption, the Supreme Court observed that the two subsections at issue targeted

distinct harms: subsection (1) addresses the abduction and restraint of child victims, whereas subsection (6) addresses the targeting of children by strangers that are sexual predators. Id., 695. Consequently, "the harms targeted in the two subdivisions . . . do not necessarily coexist in every aggravated sexual assault of a minor." Id.

In the present case, the state argues that the three statutes at issue also target separate and distinct societal harms: § 53-21 (a) (2) targets "contact with intimate parts in a sexual and indecent manner likely to impair health or morals"; § 53a-70 (a) (2) targets "sexual intercourse when the actor [is] at least two years older" than a victim that is under thirteen; and § 53a-70c (a) (1) targets situations where a "victim under thirteen [is] kidnapped or restrained." Because the evils of each offense " 'do not necessarily coexist' " in every aggravated sexual assault of a minor prosecution, the state argues that they cannot be viewed as the same offense for double jeopardy purposes. The state's argument, however, ignores the fact that §§ 53-21 (a) (2) and 53a-70 (a) (2) are essential elements of § 53a-70c when they are charged as predicate offenses. Therefore, the harms targeted by §§ 53-21 (a) (2) and 53a-70 (a) (2) necessarily coexist in every § 53a-70c prosecution in which they are alleged as predicate offenses, which distinguishes this case from *Wright*.

Turning to the next factor, it is unclear from the language of the relevant statutes whether the legislature intended to specifically authorize cumulative punishments. As we previously stated, § 53a-70c requires the state to prove that a predicate offense has been committed, and, to that end, it expressly identifies § 53-21 (a) (2) and § 53a-70 as qualifying predicate offenses, which suggests that they are greater and lesser offenses. Cf. *Garrett* v. *United States*, 471 U.S. 773, 779–81, 105 S. Ct. 2407, 85 L. Ed. 2d 764 (1985) (finding evidence of intent to authorize cumulative punishments in the fact that the statute in question contained no reference to other statutory offenses). However, General Statutes § 53a-35a (3) sets forth a separate and distinct penalty from other felony offenses for a conviction under § 53a-70c.[36] Our inquiry into the legislature's intent, however, is somewhat confounded by the absence of language expressly prohibiting cumulative punishments for conduct that violates § 53a-70c because the legislature has employed such language in at least nineteen other criminal statutes,[37] including the criminal statutes for aggravated sexual assault in the first degree[38] and sexual assault in the third degree with a firearm.[39] "Since the legislature has shown that it knows how to bar multiple punishments expressly when it does not intend such punishment, the absence of similar language [in a criminal statute] provides evidence that the legislature intended cumulative punishment." *State* v. *Greco*, supra, 216 Conn. 295.

We turn therefore to the legislative history of § 53a-70c, which reveals that its enactment was the product of a compromise between legislators that wanted to limit judicial discretion when sentencing sexual offenders of children and legislators that wanted to safeguard prosecutorial discretion and the plea bargaining process. That compromise resulted in what legislators referred to as the "new crime" of aggravated sexual assault of a minor, which enabled, but did not require, prosecutors to pursue enhanced, mandatory sentences for sexual offenders of children when, in their judgment, the facts and circumstances of the particular case warranted a significant mandatory minimum sentence. Overall, although the legislative history of § 53a-70c reveals a clear legislative intent to specifically authorize enhanced, mandatory penalties, it does not reveal a clear legislative intent to specifically authorize cumulative punishments for § 53a-70c and its predicate offenses.

Section 53a-70c is part of a series of statutes commonly referred to as Jessica's Law. The impetus for Jessica's Law was the tragic murder of nine year old Jessica Lunsford, who was abducted from her Florida home by a registered sex offender and sexually assaulted before being buried alive. M. Bell, "Grassroots Death Sentences?: The Social Movement for Capital Child Rape Laws," 98 J. Crim. L. & Criminology 1, 16–17 (Fall 2007); T. Aguayo, "Sex Offender Guilty of Rape and Murder of Florida Girl," The New York Times (March 8, 2007), available at http://www.nytimes.com/2007/03/08/us/08verdict.html (last visited January 23, 2017). One of the many initiatives of Jessica's Law is to create higher mandatory penalties for first and second time sexual offenders of children to ensure that they are unable to reach future victims. M. Bell, supra, 17.

Jessica's Law was first proposed in Connecticut in 2006. The original bill proposed amending the sentencing provisions of certain sexual offenses[40] to create high mandatory minimum sentences when the victim was under the age of thirteen.[41] The bill did not alter the legal structure of the underlying sexual offenses.[42] Some legislators were concerned, however, that the proposed bill would hamper the plea bargaining process and prosecutors' ability to pursue a lesser offense, and lesser penalties, if the facts and circumstances of the case did not warrant a high mandatory minimum sentence.[43] In particular, they noted the wide array of sexual offenses encompassed by the bill and the fact that the bill (without qualification) required a high mandatory minimum sentence when the victim was under thirteen years old.[44] Although the proponents of the original bill maintained that prosecutors would retain their discretion in charging,[45] the bill was held over to the next legislative session.

In 2007, a revised bill was introduced. To address the

concerns raised about the original bill, the revised bill consolidated the enhanced penalties for the sexual assault of a child under the age of thirteen into the "new crime" of aggravated sexual assault of a minor.[46] Despite the new nomenclature, the legislature continued to treat this provision as a sentencing enhancement during legislative hearings. In particular, proponents of the bill touted this new crime as a "tool" that could be utilized by prosecutors to secure a high mandatory minimum sentence when the facts and circumstances of the case warranted it.[47] The revised bill was ultimately passed and codified, in relevant part, at § 53a-70c.

It is clear from the legislative history of § 53a-70c that the legislature wanted to authorize high mandatory minimum sentences for sexual offenders of children. Initially, the legislature sought to obtain this result by amending only the sentencing provisions of each relevant statute. When concerns were raised about the effect of the original bill on prosecutorial discretion and the plea bargaining process, the legislature created the "new crime" of aggravated sexual assault of a minor. This new crime was designed to give prosecutors the discretion to charge *either* the greater offense with its high mandatory sentencing provision *or* the lesser offenses with those standard sentencing provisions, depending on the facts and circumstances of the case. It is not clear from this legislative history, however, that the legislature intended to specifically authorize cumulative convictions and sentences for aggravated sexual assault of a minor and the charged predicate offense(s).[48]

Therefore, on the basis of our examination of the language, structure, and legislative history of § 53a-70c, we conclude that the state has failed to rebut the presumption created by the *Blockburger* test that § 53a-70c is the same offense as its charged predicate offenses for the purposes of double jeopardy. Accordingly, the defendant's cumulative convictions and sentences for the three sexual offenses violates his right against double jeopardy.

B

Having determined that the defendant's cumulative convictions and sentences for aggravated sexual assault of a minor, sexual assault in the first degree, and risk of injury to a child violate double jeopardy, we must determine the appropriate remedy. The defendant argues that the court must vacate his convictions and sentences for both lesser offenses, i.e., sexual assault in the first degree and risk of injury to a child. The state responds that we should vacate the defendant's conviction and sentence for *only one* of the lesser offenses because the state charged only one count of aggravated sexual assault when it could have charged two counts (i.e., it could have charged one count for each predicate offense). Therefore, the state reasons

that "vacating both lesser charges would grant the defendant a windfall he is not entitled to," namely, fifteen fewer years imprisonment. We are not persuaded that the remedy advocated by the state is available to us.

The following facts are relevant to our resolution of this issue. On June 18, 2014, the court imposed a total effective sentence of fifty years imprisonment, thirty years of which were a mandatory minimum, followed by five years of special parole. For the sexual assault information, the court imposed a sentence of forty years imprisonment, thirty years of which were a mandatory minimum, followed by five years of special parole. Specifically, on count one, sexual assault in the first degree, the court sentenced the defendant to twenty years imprisonment, five years of which were a mandatory minimum, followed by five years of special parole, to be served concurrently with count three. On count two, risk of injury to a child, the court sentenced the defendant to fifteen years imprisonment, five of which were a mandatory minimum, to be served consecutively to counts one and three. On count three, aggravated sexual assault of a minor, the court sentenced the defendant to twenty-five years imprisonment, twenty-five of which were a mandatory minimum, to be served concurrently with count one. For the escape information, the court imposed a sentence of ten years imprisonment, to be served consecutively to count two of the sexual assault information.

Our Supreme Court's holding in *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013), controls in this circumstance. In *Polanco*, the Supreme Court, exercising its supervisory authority, held that when a defendant is convicted of greater and lesser offenses, the court must vacate the lesser offense(s). Id., 255; see also *State* v. *Miranda*, 317 Conn. 741, 751, 120 A.3d 490 (2015) (holding that vacatur was the appropriate remedy for the double jeopardy violation caused by cumulative convictions and sentences for capital murder and felony murder). In the present case, it is undisputed that it was impossible for the defendant to commit the greater offense (aggravated sexual assault of a minor), in the manner charged in the long form information, without committing the lesser offenses (sexual assault in the first degree and risk of injury to a child).[49] Therefore, pursuant to *Polanco*, the convictions and sentences for the lesser offenses must be vacated.[50]

Accordingly, we remand the case to the trial court to vacate the defendant's convictions and sentences for risk of injury to a child and sexual assault of a minor. We direct the trial court to resentence the defendant for his remaining convictions of aggravated sexual assault of a minor and attempt to escape custody.[51] See *State* v. *Wade*, 297 Conn. 262, 271–72, 998 A.2d 1114 (2010).

The judgment is reversed only as to the defendant's

convictions of sexual assault in the first degree and risk of injury to a child, and the case is remanded to the trial court with direction to vacate the convictions of those offenses and to resentence the defendant on the remaining charges. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim, others individuals or locations through which the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] The victim was eleven years old at the time while the defendant was nineteen years old. At trial, the victim described the defendant as being "a lot bigger than me" at the time of the defendant's attack on her.

[3] Judge Joan K. Alexander presided over all pretrial proceedings after arraignment.

[4] See General Statutes § 54-56d (i) (1) ("[t]he period of placement under the order or combination of orders shall not exceed the period of the maximum sentence which the defendant could receive on conviction of the charges against the defendant or eighteen months, whichever is less").

[5] Judge Julia DiCocco Dewey presided over all trial and posttrial proceedings.

[6] *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong).

[7] "Nunc pro tunc means 'now for then' and is used, inter alia, to refer to competency determinations made after the time at which the underlying proceeding took place, in the present case, the defendant's criminal trial." *State* v. *Connor*, 321 Conn. 350, 365 n.6, 138 A.3d 265 (2016).

[8] The defendant alternatively asks this court to exercise its supervisory authority over the administration of justice to require trial courts to canvass defendants concerning their purported right to testify at a competency hearing. "It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 764, 91 A.3d 862 (2014). However, "[t]he exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) Id., 765. We are not convinced that it is necessary to the due administration of justice for us to invoke our supervisory authority in the present case. Our supervisory authority is meant to be utilized sparingly and only in extraordinary circumstances, which simply are not present here.

[9] Cotterell did not explicitly diagnose the defendant with malingering in the third competency report, but this diagnosis is reflected throughout that report. For example, Cotterell concluded his report by observing: "[The defendant] knows about his circumstances, and can engage with staff members on an informal basis. He has been consistent, when asked to engage in a formal examination of his competency, in repeatedly stating that he knows nothing. This is a reflection of his immaturity and impulsivity, and *there is definitely a volitional component to this presentation. It is clear that he knows more than he is willing to admit.* He is not currently taking psychiatric medication, and he has not demonstrated any symptoms of a serious mental illness that would require such treatment. Although [the defendant] frequently refuses to participate in evaluations, his refusal is not deemed to be secondary to a psychotic process or mood disorder, but rather a reflection of his long-standing pattern of oppositional conduct." (Emphasis added.) Additionally, in his posttrial competency report on the defendant, Cotterell referred to the principal diagnosis of malingering being given at the time he determined that the defendant was competent to stand trial.

[10] When discussing the defendant's behavior during his hospitalization, Cotterell observed: "[The defendant] demonstrated clinical stability. He no longer voiced delusional materials, reported no perceptual problems, and his behavior was described a[s] coherent and organized. [The defendant] began to show some concern as his return date to the court approached. He made vague claims that he was suicidal, but promptly retracted his

statement when faced with the prospect of safety measures that would be applied in such cases. His behavior suggested that he was trying to find a way to avoid facing the implications of his charges. He sometimes refused his medications at night and claimed, 'They kept me awake,' in an unconvincing manner. He asked whether he would stay longer on the unit if he were not taking his medications. The treating psychiatrist explained that we would petition the court to appoint a conservator with the authority to give us permission to medicate him if such a situation presented itself. This seemed to persuade [the defendant] not to pursue his quest for a quick way out of facing his legal obligations."

When discussing his efforts to engage the defendant in a conversation about the different elements of the legal system, Cotterell stated that "[the defendant] did not appear to be motivated to participate in the evaluation and did not appear to be putting forth his best effort."

[11] The defendant also asks this court to invoke its supervisory authority. We are not convinced that this claim presents extraordinary circumstances warranting an exercise of our supervisory authority. See footnote 8 of this opinion.

[12] General Statutes § 17a-566 states in relevant part: "(a) . . . any court prior to sentencing a person convicted . . . of a sex offense involving . . . disparity of age between an adult and a minor . . . may if it appears to the court that such person has psychiatric disabilities and is dangerous to himself or others, upon its own motion or upon request of any of the persons enumerated in subsection (b) of this section and a subsequent finding that such request is justified, order the commissioner to conduct an examination of the convicted defendant by qualified personnel of the division. . . .

"(b) The request for such examination may be made by the state's attorney or assistant state's attorney who prosecuted the defendant for an offense specified in this section, or by the defendant or his attorney in his behalf. . . ."

[13] The record indicates that, because of the defendant's behavior during their meetings, defense counsel had informed the court and the state that he intended to move for a competency evaluation prior to the hearing and prior to the defendant's misconduct while being transported.

[14] The court engaged in the following colloquy with the defendant:

"The Court: Now, they've attempted to do the competency evaluation but they've had some difficulty because you don't wish to participate in it. That is your option—

"[The Defendant]: Participate in mental health?

"The Court: The competency evaluation.

"[The Defendant]: Yes.

"The Court: I would like for you to participate. I can't force you to, but it would make the—

"[The Defendant]: Nah. Nah.

"The Court: —the decision easier.

"[The Defendant]: I would like not to participate in mental health because I'm not a mental health client.

"The Court: Well, this isn't to see if whether you're a mental health client. This is to see whether—

"[The Defendant]: I'm competent to stand trial.

"The Court: No. You're competent to be sentenced. There's a difference. So I would not sentence you unless you're competent to be sentenced. What I am going to do is order the evaluator to have access to your medical and mental health records—

"[The Defendant]: I think I'm in the wrong court.

"The Court: No, you're in the right court.

"[The Defendant]: No, I'm in the wrong court. This is not even the right court. . . .

"[The Defendant]: All right. I'll cooperate.

"The Court: Good. And they're also going to have access to your records. The fact that you're cooperating doesn't necessarily mean you're going to go to a mental health facility, but we want to know what is best for you and best for the state in terms of the sentencing. I appreciate your cooperation. Thank you very much."

[15] On June 18, 2014, the court held a video conference to make a technical change to the defendant's sentence. When the defendant apologized for his expletory remarks to the court during sentencing, the court vacated the defendant's sentence for contempt. After the court stated that it was imposing a total effective sentence of fifty years imprisonment for the substantive offenses, however, the defendant began arguing that he was innocent and

wrongly convicted.

[16] *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987).

[17] The defendant also claims that the court abused its discretion by granting the state's motion for consolidation because the motion was untimely. We disagree. Practice Book § 41-5 states in relevant part: "Unless otherwise provided by these rules or statute, all pretrial motions or requests shall be made not later than ten days after the first pretrial conference in the court where the case will be tried, or, *with permission of the judicial authority, at such later time as the judicial authority may fix.*" (Emphasis added.) See also Practice Book § 41-3 (4) (authorizing pretrial motions for joinder). In the present case, by accepting the state's motion to consolidate over the defendant's objection, the court permitted the state to file the motion to consolidate later than ten days after the first pretrial conference.

The defendant nevertheless contends that the court abused its discretion by permitting the state to file a late motion to consolidate because it hindered his ability "to *meaningfully* and *intelligently* consider and assess the defense options and strategies at a consolidated trial." (Emphasis in original.) However, the defendant never expressed any concerns at the hearing or at trial about the effect consolidation would or did have on his ability to prepare for trial. Because this claim was not distinctly raised before the trial court, we cannot review it on appeal. See *Mitchell* v. *Commissioner of Correction*, 156 Conn. App. 402, 408–409, 114 A.3d 168, cert. denied, 317 Conn. 904, 114 A.3d 1220 (2015).

[18] The state filed its initial motion to consolidate in the morning of September 19, 2013 and the revised motion to consolidate in the afternoon. The state also filed two long form informations, one for the sexual assault case and one for the attempt to escape case. The long form sexual assault information added the charge of aggravated sexual assault of a minor.

[19] Specifically, the state argued that the defendant's attempt to escape would have been admissible as evidence of consciousness of guilt in a separate trial on the sexual assault information. It also argued that evidence that the defendant was charged with felony sexual assault offenses would have been admissible in a separate trial on the escape information to prove that the defendant was in custody and charged with a felony at the time he attempted to escape.

[20] The state raises two arguments on appeal concerning the cross admissibility of the sexual assault evidence in a separate escape trial. First, the state argues that "the [sexual] assault charges were relevant to show a heightened motivation to escape . . . because the defendant faced 'extremely serious' charges (class A and B felonies) carrying mandatory minimum sentences based on the victim's age . . . ." Second, the state argues that "the record shows that when the factual basis of the assault became known to other inmates, they harassed the defendant, providing further incentive to escape." We first note that it is unclear whether the court was aware that the defendant was being harassed by other inmates at the time it granted the state's motion because this fact was only mentioned in Cotterell's *posttrial* competency report. Additionally, because these arguments were never presented to the trial court, and, therefore, cannot serve as a basis for the trial court's decision to grant the motion to consolidate, we decline to address them now on appeal. See Practice Book § 60-5.

[21] It is undisputed that the first and third *Boscarino* factors were not present at the consolidated trial. The two sets of charges involve discrete and easily distinguishable factual scenarios. Additionally, the consolidation of the cases for trial did not increase the duration or complexity of the trial because the escape charge required the presentation of only the brief testimony of two judicial marshals and the defendant.

[22] During the defendant's attempt to escape, it took approximately four judicial marshals to subdue and restrain him.

[23] We reiterate that evidence concerning the escape charge could have properly been admitted in a separate trial for the sexual assault charge because escape indicates consciousness of guilt. "[When] evidence of one incident can be admitted at the trial of the other [incident], separate trials would provide the defendant . . . [with] no significant benefit. [U]nder such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Internal quotation marks omitted.) *State* v. *Crenshaw*, supra, 313 Conn. 83–84.

[24] Only at trial did the victim testify, inter alia, that the defendant pushed her up the stairs, that she screamed for help when he did that, that the defendant pushed her into his bedroom, and that she tried to fight him off by hitting and kicking him. The defendant impeached this testimony during his cross-examination of the officer that interviewed the victim after her

sexual assault. This officer testified that the victim never told him that the defendant pushed her up the stairs, that she screamed for help, that she was pushed into the defendant's apartment, or that she tried to fight off the defendant by hitting and kicking him.

[25] See *State* v. *Crenshaw*, supra, 313 Conn. 89 ("it is well established that the trial court, in making the discretionary, pretrial decision to join multiple cases, rules on whether the evidence *could* be admissible, not whether the evidence actually *is* admitted" [emphasis in original]); *State* v. *Davis*, 286 Conn. 17, 47, 942 A.2d 373 (2008) (*Katz, J.*, concurring) ("The trial court's rulings on such motions usually are predicated on the face of the charging document and whatever information is provided to the court regarding evidence to be adduced at trial. Therefore, the reviewing court necessarily must base its determination as to whether the trial court abused its discretion by looking to the state of the record at the time the trial court acted, not to the fully developed record after trial."), overruled on other grounds in *State* v. *Payne*, 303 Conn. 538, 549, 34 A.3d 370 (2012); *State* v. *Perez*, 147 Conn. App. 53, 128–129, 80 A.3d 103 (*Lavine, J.*, concurring) (the trial court's pretrial decision to join or to sever the cases must be reviewed based only on the information before the trial court at the time it decides the motion), aff'd, 322 Conn. 118, 139 A.3d 654 (2013).

[26] To prove aggravated sexual assault of a minor, as charged, the state had to prove that the defendant "illegally restrained" the victim. See General Statutes § 53a-70c (a) (1). " '[R]estrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein 'without consent' means, but is not limited to, (A) deception and (B) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old . . . and the parent . . . has not acquiesced in the movement or confinement." General Statutes § 53a-91 (1).

[27] The defendant cites article first, § 8, of the Connecticut constitution as an alternative source of his right to remain silent. To the extent the defendant seeks to raise a distinct claim under the Connecticut constitution, we decline to address it because he failed to provide an independent analysis of this state constitutional claim. See *State* v. *Skok*, 318 Conn. 699, 701 n.3, 122 A.3d 608 (2015).

[28] The defendant also invokes his rights under article first, § 7, of the Connecticut constitution. Because the defendant failed to provide an independent analysis of this claim under the Connecticut constitution, we decline to address it. See *State* v. *Skok*, 318 Conn. 699, 701 n.3, 122 A.3d 608 (2005).

[29] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[30] See *State* v. *Smith*, 321 Conn. 278, 288, 138 A.3d 223 (2016) ("[t]he definition of interrogation [for purposes of *Miranda*] can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response" [emphasis in original; internal quotation marks omitted]).

[31] The defendant cites article first, §§ 8 and 9, of the Connecticut constitution as an alternative source of his right against double jeopardy. To the extent the defendant seeks to raise a distinct claim under the Connecticut constitution, we decline to address it because he failed to provide an independent analysis of this claim under the Connecticut constitution. See *State* v. *Skok*, 318 Conn. 699, 701 n.3, 122 A.3d 608 (2015).

[32] *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[33] Count three of the long form information states in relevant part: "The undersigned Senior State's Attorney further accuses the defendant, CHRISTOPHER BURGOS, of the crime of AGGRAVATED SEXUAL ASSAULT OF A MINOR . . . and alleges that . . . the defendant committed a violation of Connecticut General Statutes §§ 53a-70a (a) (2) and 53-21 (a) (2) and the victim of such offense . . . was under thirteen years of age and the defendant illegally restrained said person."

Notably, the long form information charges aggravated sexual assault in the first degree, in violation of § 53a-70a (a) (2), as a predicate offense rather than sexual assault in the first degree in violation of § 53a-70 (a) (2). This is evidently a typographical error. At trial, the parties and the court operated under the assumption that sexual assault in the first degree was one of the predicate offenses for count three. When the court read the information at the start of trial and charged the jury, it stated that sexual assault in the

first degree was one of the predicate offenses for count three. Neither party objected to this reading of the information or the content of the jury charge. Additionally, in their briefs on appeal, both parties have referred to sexual assault in the first degree as being one of the predicate offenses in count three. Therefore, we will continue to refer to sexual assault in the first degree as the appropriate predicate offense.

[34] We recognize that when interpreting the meaning of a statute we ordinarily begin our analysis with General Statutes § 1-2z. However, in the present matter, we *are not* engaging in a *linguistic analysis* of § 53a-70c in an attempt to discern the meaning and effect of specific words or phrases contained in § 53a-70c. Instead, we are engaging in a *constitutional analysis* of § 53a-70c in an attempt to discern whether the legislature clearly intended to specifically authorize cumulative punishments for convictions under § 53a-70c and the charged predicate offense(s).

[35] General Statutes § 53a-70c (a) provides: "A person is guilty of aggravated sexual assault of a minor when such person commits a violation of subdivision (2) of subsection (a) of section 53-21 or section 53a-70, 53a-70a, 53a-71, 53a-86, 53a-87 or 53a-196a and the victim of such offense is under thirteen years of age, and (1) such person kidnapped or illegally restrained the victim, (2) such person stalked the victim, (3) such person used violence to commit such offense against the victim, (4) such person caused serious physical injury to or disfigurement of the victim, (5) there was more than one victim of such offense under thirteen years of age, (6) such person was not known to the victim, or (7) such person has previously been convicted of a violent sexual assault."

[36] As discussed later in this opinion, the primary purpose of the legislation that created § 53a-70c was to create new, enhanced mandatory minimum sentences for individuals that sexually assault children.

[37] See General Statutes §§ 53a-55a (a), 53a-56a (a), 53a-59a (b), 53a-59b (b), 53a-60a (a), 53a-60b (b), 53a-60c (b), 53a-61a (b), 53a-61aa (a), 53a-64aa (b), 53a-64bb (b), 53a-64cc (b), 53a-70a (a), 53a-72b (a), 53a-92a (a), 53a-94a (a), 53a-102a (a), 53a-103a (a), and 53a-216 (a).

[38] General Statutes § 53a-70a (a) states in relevant part: "No person shall be convicted of sexual assault in the first degree and aggravated sexual assault in the first degree upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information."

[39] General Statutes § 53a-72b (a) states in relevant part: "No person shall be convicted of sexual assault in the third degree and sexual assault in the third degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information."

[40] General Statutes §§ 53-21 (a) (2) (risk of injury to a child), 53a-70 (sexual assault in the first degree), 53a-70a (aggravated sexual assault in the first degree), 53a-71 (sexual assault in the second degree), 53a-72a (sexual assault in the third degree), 53a-86 (promoting prostitution in the first degree), 53a-87 (promoting prostitution in the second degree), 53a-90a (enticing a minor), 53a-196 (obscenity as to minors), 53a-196a (employing a minor in an obscene performance), and 53a-196b (promoting a minor in an obscene performance).

[41] The original bill as passed by the Senate proposed amending the sentencing provisions of several sexual offenses to impose a mandatory minimum sentence of twenty-five years imprisonment if the victim is under thirteen years old. For example, § 53-21 (a) (2) would have been amended to contain the following clause: "if . . . the victim of the offense is under thirteen years of age, [the defendant] shall be guilty of a class A felony and, for a first offense, be sentenced to a term of imprisonment of twenty-five years which may not be suspended or reduced by the court and, for a subsequent offense, be sentenced to a term of life imprisonment." Senate Amendment Schedule A, LCO #4256, to Senate Bill No. 360, 2006 Sess.

[42] 49 S. Proc., Pt. 9, 2006 Sess., p. 2835, remarks of Senator John A. Kissel (stating that this law would "leave the underlying constructs of the crime of sexual assault intact. It doesn't change what needs to occur to have the crime occur, but what it does is it enhances the penalties. . . . What it does is it changes significantly the mandatory minimum sentence that can be imposed by the court."); id., p. 2842, remarks of Senator John A. Kissel ("[N]one of the underlying parameters of what constitutes the [predicate] crime has changed. *All we're doing is we're reaching in and we're addressing what the punishment should be.*" [Emphasis added.]); id., p. 2849, remarks of Senator John A. Kissel ("Again, we have not offered to change the underlying statutory construct in our state by way of this amendment. *We are enhancing the penalties.*" [Emphasis added.]); id., p. 2861, remarks of Senator John McKinney ("We are not changing the elements of any crime. This amendment does not change existing law as to the elements

of the crime. All it says is that it's going to have a harsher penalty."); 49 S. Proc., Pt. 11, 2006 Sess., p. 3292, remarks of Senator Catherine W. Cook ("This is a bill about sentencing. It's not a bill about whether someone might or might not have committed the crime. This is about after the court, after the jury has decided this person did such terrible things to a child."); id., pp. 3295–96, remarks of Senator Martin M. Looney ("This [modification to the bill] now clarified that the enhanced minimum mandatory [sentence] of twenty-five years will apply if the victim is under the age of thirteen . . . . So it establishes . . . that we do reserve our most serious penalties for the most serious offenses. . . . This does target the crime of sexual assault in the first degree, and aggravated sexual assault in the first degree, *as suitable for this enhanced penalty.*" [Emphasis added.]).

[43] 49 S. Proc., Pt. 9, 2006 Sess., pp. 2851–52, remarks of Senator Andrew J. McDonald ("[The proposed amendment] basically incorporates the entire spectrum of options that a prosecutor would have available to him or her. And under this proposal that prosecutor would not have any discretion, but, in fact, would be compelled to bring that child or adult, as the case may be, regardless of the circumstances, and limit the discretion of the court [in sentencing]. And that is an issue that I think every member should have in mind when they vote on this."); id., p. 2854, remarks of Senator Edward Meyer (referring to Senator McDonald's concerns about a twelve year old being charged with a mandatory minimum sentence for touching inner thigh of another twelve year old, Senator Meyer asked "what would be the plea bargain available to the prosecutor and the defense lawyer to avoid an injustice, an excessive injustice"); see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 19, 2007 Sess., p. 6147, remarks of Senator John McKinney ("I think the Chief State's Attorney is here again today, but he expressed concern, as I know did Chairman [Representative Michael P.] Lawlor and others, that prosecuting, if it's twenty-five years or nothing, people will not reach plea agreements, and you'll have to take a lot of cases to trial, and some people may get off").

[44] See footnotes 40 and 41 of this opinion.

[45] See 49 S. Proc., Pt. 9, 2006 Sess., p. 2853, remarks of Senator John A. Kissel ("What this does is it targets certain specific areas. But if a state's attorney wanted to reduce the charge to something else, there's plenty of other ways to go."); id., p. 2859, remarks of Senator John McKinney ("[H]ow is it that on the one hand mandatory minimums don't work because prosecutors can charge down, they don't have to charge *the higher crime* with the mandatory minimum. In fact, I would ask if you could read this bill to find anywhere where it requires a prosecutor to bring charges under circumstances [where the offense conduct involves two young adolescents]." [Emphasis added.]).

[46] The predicate offenses of the revised bill were General Statutes §§ 53-21 (a) (2), 53a-70, 53a-70a, 53a-71, 53a-86, 53a-87, or 53a-196a. Cf. footnote 40 of this opinion. Although General Statutes § 53a-90a (enticing a minor) was no longer included as a predicate offense, the revised bill did create enhanced penalties for enticement of a minor when the victim is under the age of thirteen. See Public Acts 2007, No. 07-143, § 5. However, the revised bill no longer created enhanced penalties for violations of General Statutes §§ 53a-72a (sexual assault in the third degree), 53a-196 (obscenity as to minors), or 53a-196b (promoting a minor in an obscene performance).

[47] For example, during a Judiciary Committee Hearing, Senator John McKinney highlighted the fact that while "this new crime gives the prosecutors the tool to put the most heinous of predators behind bars for a very long time . . . it gives the prosecutors the lesser offenses in those cases that warrant it. In that respect, it addresses the concerns raised by the Chief State's Attorney regarding the all or nothing approach included in prior drafts of this bill." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 19, 2007 Sess., pp. 6138–39, testimony of Senator John McKinney. Similarly, Senator John A. Kissel analogized the bill to an arrow in the prosecutor's quiver, stating that "in the case where they have ample evidence, and they really want to throw the book at someone, the twenty-five year mandatory minimum is there." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 20, 2007 Sess., p. 6486, remarks of Senator John A. Kissel; see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 21, 2007 Sess., p. 6599, written testimony of Senator Louis C. DeLuca ("This bill will put predators where they belong—behind bars where they can do no harm to our children. It will take those who prey on children and keep them off our streets for twenty-five years the first time they abuse a child. If they do it again, they will spend the next fifty years in jail."); id., p. 6603, written testimony of Senator Dan Debicella ("Connecticut needs a law on the books that imposes punishment that fits the crime [of child molestation]. . . . Twenty-five

years, or more, in prison is not too much to demand of sexual predators.").

[48] The state's reliance on *State* v. *Wright*, supra, 319 Conn. 684, to support its contention that the legislature clearly intended to authorize multiple punishments is misplaced. *Wright* is again distinguishable from this case for two distinct reasons. First, in *Wright*, our Supreme Court was never asked to consider whether the legislature intended to authorize multiple punishments for violations of § 53a-70c and the charged predicate offense. Quite to the contrary, in *Wright*, the Supreme Court observed that "the trial court vacated the defendant's convictions of [the lesser offenses of] risk of injury to a child and unlawful restraint pursuant to [its] decision in *State* v. *Polanco*, 308 Conn. 242, 245, 61 A.3d 1084 (2013) . . . ." *State* v. *Wright*, supra, 687 n.2. Second, it bears repeating that because the two statutory subsections in *Wright* were factually and legally distinct the burden was on the defendant to rebut the *Blockburger* presumption. Id., 691–92. In this case, the *Blockburger* presumption is against the state, and the state bears the burden of demonstrating that the legislature clearly intended to specifically authorize cumulative punishments.

[49] See footnote 35 of this opinion.

[50] The state maintains that only one lesser offense should be vacated lest the defendant be granted a "windfall" of fifteen fewer years of imprisonment. That is, if the lesser offenses are vacated, the defendant's effective sentence for his convictions under the sexual assault information will be twenty-five years imprisonment, rather than forty years imprisonment. The state's argument is premised on the fact that *it could have charged* two counts of aggravated sexual assault of a minor—one count alleging sexual assault in the first degree as a predicate offense and one count alleging risk of injury to a child as a predicate offense. The fundamental flaw in the state's argument, however, is that *it did not charge* the defendant with two counts of aggravated sexual assault of a minor. It charged the defendant with one count of the greater offense and two counts of lesser offenses.

[51] Resentencing for the defendant's convictions for aggravated sexual assault of a minor and attempt to escape custody is appropriate in the present case because our decision alters the defendant's total effective sentence. *State* v. *Wade*, 297 Conn. 262, 271–72, 998 A.2d 1114 (2010). At sentencing, the court imposed a total effective sentence of fifty years imprisonment, followed by five years of special parole. To achieve the total effective term of imprisonment, the court imposed three consecutive sentences. Specifically, the court ordered that the defendant's sentence for risk of injury to a child (fifteen years imprisonment) be served consecutively to his sentence for aggravated sexual assault of a minor (twenty-five years imprisonment, followed by five years special parole). The court also ordered that the defendant's sentence for attempt to escape (ten years) be served consecutively to his sentence for risk of injury to a child. Therefore, vacatur of the defendant's risk of injury to a child conviction will alter the defendant's total effective sentence by reducing it from fifty years imprisonment to twenty-five years imprisonment. Additionally, the court imposed a term of special parole under the defendant's sexual assault in the first degree conviction. Therefore, vacatur of the defendant's sexual assault in the first degree conviction will eliminate the period of special parole imposed by the original sentencing court.